Curtis *v.* Keesler.

———————•-○-•———————

## CURTIS and others *vs.* KEESLER.

A stream, nearly 200 miles above tide water; in which the tide does not ebb and flow; which has never been declared a public highway, by statute; which is not capable of being used at any time for the passage of vessels or boats, or of floating rafts or logs, except when swelled by rains, or the melting of snow, is not in any legal sense a navigable stream, but is private property, not subject to the servitude of the public interest by a passage upon it, unless the use of it has been dedicated to the public, by the owners.

And where the owner of land on both sides of such a stream has erected a dam across the same, to supply his mills, which would be injured by the floating of logs down the stream, over such dam, he is entitled to an injunction.

The public cannot acquire an easement, by prescription. The doctrine is inapplicable to the public. A prescription supposes a grant, and in the case of the public there can be no grantee.

Use alone, by the public, is not enough to establish the fact of a dedication, except in the case of streets or roads. There must be proof by writing, or by public and unequivocal declarations or acts, on the part of the owner of the land. Though *user* may be taken in connection with other evidence, to prove actual dedication.

The right to float logs in a stream for a few days in each year, during the freshets, in such a manner as to endanger and seriously injure the dams thereon, and which right can only be enjoyed by a few individuals, cannot be made the subject of a dedication to the public.

THE complaint in this action alledged and set forth that the plaintiffs were the owners of certain real estate in Cochecton, Sullivan county, described as in division lot No. 60, in great lot No. 1 of the Hardenburgh patent, containing about 650 acres ; that a stream of water called and known as the Callikoon creek, ran through the said land for about one mile ; that on the said premises they had recently constructed a dam across the creek, at large expense, and in connection with the dam they had and owned a saw-mill, which was furnished with water to propel its machinery from the pond created by the construction of the dam ; that a dam had been constructed and maintained at the same place, and a mill built there and used and occupied for at least thirty years past until about five years ago, when the same was destroyed by a flood, and had been rebuilt by the plaintiffs, and was a very valuable place for business ; that the plaintiffs were engaged in manufacturing lumber at such mill as fast and to as great an extent as the power and machinery of the mill would permit ; that the Callikoon creek was a fresh water creek emptying into the Delaware river, at a point many miles above the ebbing and flowing of the tide ; that it never had been a navigable stream, for boats or rafts, except that between the time when the dam first constructed was destroyed, and the time of the construction of the present dam, (which was a period of about five years,) a few small rafts might have been put in and floated down the stream from some point higher up than where the plaintiffs' dam was ; that the plaintiffs were the sole and exclusive owners and proprietors of the said stream and the land under the same, and on both sides thereof, for about one mile above and at least one-eighth of a mile below their mill ;

Curtis *v.* Keesler.

that the defendant owned or claimed to own, certain real estate some three miles distant from the mill of the plaintiffs, but not upon or along or adjoining the creek, and that he had cut and drawn, or caused to be cut and drawn, a large quantity of hemlock logs and deposited them on the bank of the stream, about one mile above the plaintiffs' dam, with an avowed intention of throwing the same into the stream and floating them down to the pond of the plaintiffs and over the dam into the Delaware river; and that the defendant had declared his intention to do so, as soon as the water was of sufficient height by the rains which were expected soon to fall; that the running of the logs over the dam would result in great injury to the same, and probably cause its destruction, by creating a greater pressure upon it than it was able to sustain, and by undermining it in the falling or pitching of the logs over the dam; that the loss or injury to the dam would injure the business at the mill, and be an injury to the plaintiffs; that the pecuniary responsibility of the defendant was questionable, and that in the event of the destruction of the dam, the defendant would not be of sufficient pecuniary means to pay the damages which the plaintiffs would necessarily sustain. The complaint then asked that an injunction might be granted, restraining the defendant and all persons acting under, for, by or through him, from putting or placing logs, rafts or timber in the stream for the purpose of floating them into the said pond, or over the dam of the plaintiffs.

The answer of the defendant admitted that the plaintiffs had a deed of the premises described in the complaint; but alledged that the defendant did not know whether the person from whom they purchased had a valid and legal title. It denied that there had been a dam maintained at the place specified in the complaint, and that there had been a mill used and occupied there for the length of time mentioned in the complaint. It admitted that the defendant had deposited logs upon the banks of the stream, for the purpose of putting them in and floating them down the stream. It then alledged and set forth that the stream of water known as the Callikoon creek, was a navigable stream, for rafts or boats, and that the same had been used (as the de-

fendant had been informed and believed,) for forty years and upwards by the inhabitants of the towns of Callikoon and Cochecton, in the county of Sullivan, for the purpose of floating down rafts, logs, lumber, &c. into the Delaware river ; that the stream, before the same was obstructed by a dam, was a navigable stream for rafts or boats, and that it would still be navigable for boats or rafts if the said obstruction were removed.

The reply of the plaintiffs, took issue on the new matter alledged in the answer.

The cause was refered to a referee to take proofs of the facts, and report the same to the court. It came on to be heard at a circuit and special term, held in and for the county of Sullivan, by Mr. Justice WRIGHT, on the 29th of May, 1852.

The facts appearing from the evidence in the case were substantially these. In 1814, Edward Griswold, who resided on Long Island, became the owner of a tract of land, described as division lot No. 60, in great lot No. 1 of the Hardenburgh patent. This tract was situate in the western part of the county of Sullivan, part in the present town of Callikoon and part in the town of Cochecton. Prior to and at the time of Griswold's purchase and ownership, the county was a wilderness. What is now called and known as the Callikoon creek ran through the tract. This creek rises in the present town of Callikoon, and empties into the Delaware river at a point about two hundred miles above tide water. The creek has two branches which unite; something like a mile above the point where the dam of the plaintiffs is located, and about one and a half miles from its mouth. In 1814, Griswold erected a dam and saw-mill on the creek, and upon his tract of land. At this time there were but three or four settlers on or in the neighborhood of the tract. James C. Curtis, one of the plaintiffs, was his agent in the management of the lands and mill. In 1837, James C. Curtis became the owner (deriving title from Griswold) of an undivided half of 650 acres of the Griswold tract, and in 1848, William H. Curtis, another of the plaintiffs, purchased the remaining half. The Griswold mill and dam were upon that part of the tract so purchased, and were located from a quarter to a half mile from

the mouth of the creek, where it empties into the Delaware. The dam erected by Griswold remained until 1846, when it was swept away by a flood. In 1850, the plaintiffs rebuilt the presest dam upon the site of the old one.

The Callikoon is a narrow, shallow stream, with occasional eddies. In its natural state, there is not sufficient water to float a log or slab upon it, and it is only when affected by freshets that either logs or rafts can be floated upon it. It is only at the period when swelled by rains or the melting of snow and ice, that either a raft or a log or timber can be floated in it. It is not at any time navigable for boats, nor has it ever been used for that purpose. Griswold erected the first dam on the stream. Prior to this, there was no occupancy of his tract, or of the country through which the stream ran. The owners of the lands were non-residents. Occasionally, persons residing in the neighborhood, who were not the owners of the lands, would enter upon them, cut logs, float them into an eddy, where the pond made by Griswold's dam now is, raft them and float the raft (the stream being swelled) into the Delaware. After the erection of the Griswold dam, there was no rafting above it; but whatever logs were rafted by others were floated singly over the dam and rafted below, unless it may have been during the period of the destruction of the old dam and the erection of the new one. Griswold always kept a boom across the pond created by the dam. He claimed the right to prevent the floating and rafting of logs by others. For several years (one of the witnesses says ten) after the Griswold dam was erected, there was no use made of the creek for floating by persons other than those in the service of Griswold. With the increase of the inhabitants of that region the lumbering business increased and more timber came down. Griswold sold some land up the stream. A number of persons assumed to exercise the right of floating logs down the stream and over the dam during the freshets; but the agent of Griswold and subsequent owners, claimed the right to control the floatage, and gave consent or were paid for the privilege, either by getting share money, or by selling their timber, or by receiving cash. In some other cases the right of rafting and

Curtis *v.* Keesler.

floating was exercised without any thing being said to the persons engaged. The defendant himself was amongst the number who paid for the privilege of floating logs over the dam. He and his father were amongst the persons engaged in rafting and floating logs down the stream. The dam and mill of the plaintiffs are valuable. They manufacture a large amount of lumber annually. The floating of logs over the dam endangers the maintenance of it. The tendency is to undermine and otherwise injure it, occasioning a pecuniary injury to the plaintiffs.

It was admitted that the plaintiffs owned the land over which the stream flows, and upon which the mill and dam were erected; and that the defendant had a large quantity of logs deposited on the bank of the creek, about a mile above the plaintiffs' dam, which he intended floating down the stream into the pond of the plaintiffs and over their dam into the Delaware river, as soon as the water should be of sufficient height.

*A. C. Niven,* for the plaintiffs.

*G. W. Lord,* for the defendant.

WRIGHT, J. It is not denied that the plaintiffs are the owners of the land on both sides, and over which the waters of the Callikoon creek flow. They have a saw-mill and an expensive and valuable dam upon those lands. The proof shows that the floating of rafts, or timber or logs down the creek, and over the dam into the Delaware river, would result in great injury to the dam, and probably cause its destruction; thus injuring the plaintiffs by interrupting their business at the mill. The defendant has cut and drawn to the bank of the creek, about one mile above the dam, and on the lands of one Garhart, a quantity of logs, with the avowed intention and purpose, as soon as the water is of sufficient height, by the falling of rain, to float them down the creek and over the dam of the plaintiffs, into the Delaware river. Against this threatened act of the defendant, (his pecuniary ability to respond in damages for any injury that might be occasioned, being alledged in the complaint to be

Curtis *v.* Keesler.

doubtful, and not denied by the answer,) the court is asked to interpose by injunction. If the creek called and known as the Callikoon, be merely a private stream and private property, not subject to the servitude of the public interest by a passage upon it, and there has been no dedication by the owners to the public, for the purpose of floating rafts or logs, the plaintiffs are entitled to the relief demanded. The defendant does not in his answer prescribe for himself, nor does the proof establish a case of any right on his part, distinct from the public, to use the stream. If, however, the Callikoon be a public stream, or fall within that class which is subjected to the public servitude for the purposes of navigation and commerce, or if there has been a dedication of it by the owners, to the public, for the purpose of rafting and floating logs and timber, there should be judgment for the defendant.

The treatise of Sir Mathew Hale, "*De jure maris*," with a comprehensiveness and power unparalleled, embodies the principles of the common law, relating to the respective rights of the public or the citizen, either in the sea, arms of the sea, or private streams of water. The courts of England and of this country have recognized it as the text book "from which, (as Judge Cowen remarks,) when properly understood, there seems to be no appeal either by sovereign or subject." The general distinctions established by this great man are, "that rivers not navigable, that is, fresh rivers, of what kind soever, do of common right, belong to the owners of the soil adjacent, to the extent of their land in length. But that rivers, where the tide ebbs and flows, belong of common right to the state. That the ownership of the citizen is of the whole river, viz. the soil and the water of the river; except that to his river where boats, lighters, rafts, &c. may be floated to market, the public have a right of way or easement." (*See note to Ex parte Jennings,* 6 *Cowen,* 536.) These are now the uncontrovertible principles of the common law applicable to the ownership and use of streams of water, and properly applied and understood are controlling in the case under consideration. It is true that there are streams which have

been declared by statute to be public highways, but the Calli-koon is not one of them.

The tide does not ebb and flow in the Callikoon creek. It is nearly two hundred miles above tide water. It has never been declared a public highway by statute. Is it navigable, within the meaning of the authorities, so as to subject it to the use of the public? "A stream, to be navigable," say this court, "with-in the authorities, must furnish (as Lord Hale expresses it) a *common passage for the king's people*, must be of *common or public use for carriage of boats and lighters*," must be capable of bearing up and floating vessels for the transportation of property, conducted by the agency of man.  (6 *Barb. S. C. R.* 265.  17 *John. R.* 209, 210, 211.)  It is not necessary that the stream should be navigable through its whole length.  The public may use such portions of it as are navigable ; and so far as this case is concerned, the inquiry is, whether that part of the Callikoon creek owned by the plaintiffs is, in a legal sense, "*navigable.*"  The evidence clearly establishes that the creek, in its natural state, is not capable of bearing up or floating a stick of timber or log upon its surface.  It is a narrow and shallow stream, with an occasional eddy, and near its mouth rocks are imbedded.  It is only when it is swollen by freshets, that it will bear up or float a raft of any size, or even a single log ; and it is only at these times that either logs or rafts have been floated upon its surface.  When it is swelled by rains, or the melting of snow and ice in the adjacent forests, (and then only,) single logs or small rafts of logs may be carried on its surface into the Delaware ; but it is not pretended that at any time it has been, or can be used for the passage of vessels, boats, or lighters.  Such a stream cannot, in my judgment, be said in any legal sense to be navigable for vessels, boats, lighters or rafts.  It is not the case of a stream susceptible of use for a common passage, in which the riparian owners hold a qualified property, subject to the public use.  It is not enough that it is capable, during a period, in the aggregate of some four weeks in the year, when swollen by the spring and fall freshets, of car-rying down small rafts of logs, or single logs.  As this court

Curtis *v.* Keesler.

remarked, in relation to a part of the Black river, to call such a stream *navigable,* in the legal sense, is a palpable misapplication of the term.  I am told that neither that part of the Delaware river bounding the county of Sullivan, nor the Beaverkill, are capable of floating boats, or rafts, or logs, unless swelled by freshets; yet these streams are subject to the public use.  But no argument can be drawn from this, as both of those streams have been declared public highways by statute. I am told, also, that to hold the Callikoon creek, where it runs through the lands of the plaintiffs, or streams of a similar character, not to be, in the legal sense, navigable streams, would be to inflict irreparable injury upon the persons engaged in the business of lumbering.  Possibly this may be so, but it is no adequate reason why the law should not be enforced.  In this case but few persons can be affected in any event by being deprived of the use of the stream for floatage of logs.  It is not those only engaged in the business of lumbering that have a deep interest in a correct decision of the law.  The plaintiffs in this case, and all owners of streams of the character of the Callikoon creek, have an interest in knowing whether they hold an absolute or qualified property.  If the latter, then whatever injury is to arise by an enforcement of the law, must be borne by them.

The Callikoon is not an arm of the sea in which the tide ebbs and flows.  It is not, where it runs through the lands of the plaintiffs, a stream in which the public have the right of eminent domain for the purposes of navigation and commerce.  It is not navigable, within the meaning of the authorities, and is therefore wholly and absolutely private property.

But it is further urged, that if the Callikoon be not a navigable stream, the proof shows a usage in the public, to float logs and rafts, for more than forty years prior to the commencement of this action; and that the public have acquired the right of floating, either by custom or prescription, or by dedication. From the evidence, it appears that some fifty years since, when the country adjacent to the creek was a wilderness, and there were but three or four actual settlers upon the lands bordering

on the whole length of the stream, a few persons, not the owners of the lands, cut logs, and either floated or rafted them into the Delaware. A few instances of this kind are shown prior to 1814. As the owners of the lands and creek were non-residents, neither the right to trespass on the lands, or float the plunder down the creek, were by act or word disputed. In 1814, one Edward Griswold, who resided on Long Island, became the owner of division lot No. 60, through which that part of the creek in controversy flowed. Shortly after his purchase he erected a saw-mill on the lot, and a dam across the stream, and put a tenant upon the premises. He also kept and maintained a boom across the pond formed by the dam, to prevent logs and timber from above in times of high water floating over the dam. He claimed the right to prevent the floating of logs, and for some period succeeding the erection of the dam, there was no use made of the creek for floating. As the country above became more settled, and the lumbering business increased, some persons, among whom were the defendant and his father, who had cut logs on lands above and adjacent to the stream, continued to float them down and over the dam, the agent of Griswold, and subsequent owners, asserting the right to control the floatage. In some cases they demurred and were paid for the privilege of floating, either by getting share money, or by selling their timber, or by receiving cash. Among those from whom they received a compensation for the privilege, was the defendant himself. In a few instances they consented to the floatage without compensation, and in a few others, (mostly while the old Griswold dam was away,) the right was asserted without objection on the part of the owners. The old dam was swept away by a flood, in 1846, and a new one erected on its site, by the plaintiffs, in 1850, who had then become the owners of the land and stream. It seems pretty well established, from the testimony, that during the last forty years, persons having logs above the lands and dam of the plaintiffs, have, at times, used the stream for floating them into the Delaware ; and it is equally well established, that that use has not been for any period of twenty years continuously, under a claim of right and in hostility to the claims of the owners.

Curtis v. Keesler.

The use claimed has been and necessarily must be limited in its enjoyment to a small number of persons, to be exercised only for a small part of a year, and in certain stages of the water. It is seriously to be doubted whether, if the public could acquire an easement by prescription, the use claimed and established by the evidence, is one for which they could prescribe. But the public cannot acquire an easement by prescription. The doctrine is inapplicable to the public. A prescription supposes a grant; and in the case of the public there can be no grantee. (22 *Wend.* 440 *to* 444. 20 *Id.* 121 *to* 125. 2 *John. R.* 357.) The easement by prescription is always to individuals, or to corporations, and to those who are not incompetent to receive a grant. As the law exists in this state, the only way (says Senator Furman, in the case of *Post* v. *Pearsall,* decided in the court for the correction of errors) that an individual can acquire a right in real estate, is by grant, or by an adverse possession of twenty years under claim of title, in which case the law presumes a grant; and as to the *public,* the only way in which they can, at the common law, acquire an easement in the lands of another, is by *dedication.* (22 *Wend.* 444.)

The remaining questions are, 1st. Whether the right to float logs in the manner described can be made the subject of a dedication to the public. 2d. Whether there is sufficient evidence in the case to establish the fact of such dedication.

Dedication, within the sense of the authorities, is an act by which the owner of the fee gives to the public, for some proper object, an easement in his lands. A *parol* dedication is good, and is generally the only one made; and although there is no grantee to take, it vests in the public, and is different from ordinary grants, and is to be construed upon principles to meet the nature of the case. (22 *Wend.* 444. 6 *Id.* 256. 6 *Hill,* 411. 3 *Verm. Rep.* 526. 6 *Peters,* 435.) Its effect is not to deprive a party of title to his land, but to estop him while the dedication continues in force, from asserting that right of exclusive possession and enjoyment which the owner of property ordinarily has. (6 *Hill,* 412. 6 *Peters,* 431, 438.) Use alone by the public is not enough to establish the fact of a dedication,

except in the case of streets or roads. (22 *Wend.* 474 *to* 483, *and cases cited.*) There must be proof by writing, or by public and unequivocal declarations or acts on the part of the owner of the land. Justice Cowen, in delivering the opinion of the court in the case of *Pearsall* v. *Post,* (20 *Wend.* 115,) laid down a rule which confines such dedication to streets and highways, common squares and land dedicated to pious and charitable uses. In the case of *Pearsall* v. *Post,* it was held by this court that land could not be dedicated to the public use of landing deposits from vessels; this was affirmed on error. So also in *Munson* v. *Hungerford,* (6 *Barb.* 265,) the supreme court held that the right to float logs on a stream, for three or four weeks in a year, during the freshets, in such a manner as to endanger and seriously injure the dams thereon, could not be made the subject of a dedication to the public; such a right not being in any sense a *public right* which can, from the nature of the case, be enjoyed by the public at large. So also the chancellor, in delivering his opinion in favor of the affirmance of the judgment, in the court of errors, in *Pearsall* v. *Post,* uses this language: "But a public place for landing and depositing manure, must from its very nature be confined to a very few individuals, and would generally be permitted as a mere neighborhood accommodation, while the owner of the land on which it was deposited had no immediate use for the premises himself. I think it would be most unreasonable to apply the principle of a public dedication to such a case." I cannot perceive why the reasoning in the case of *Munson* v. *Hungerford,* and the language of the chancellor in *Pearsall* v. *Post,* is not strictly applicable and controlling in the case under consideration. Here, the principle claimed must be confined to a few individuals, the owners of lands adjacent to the Callikoon creek, and the owners of the stream. The right can only be enjoyed for a few days in the year, and when the creek is swollen by rains. It cannot, from its very nature, be but a mere neighborhood accommodation, to be enjoyed but for a short time, and then only when the stream is swollen by foreign contributions. But if the right claimed by the defendant can be made the subject of a public dedication,

Curtis *v.* Keesler.

is there evidence in the case to establish the fact of such dedication? It is to be remembered that mere *user* is not sufficient; though *user* may be taken in connection with other evidence to prove actual dedication. To show that persons have exercised the right for a series of years, is but a link in the chain of proof to establish the conclusion that the owner of the fee has appropriated, or set apart, and given to the public, an easement or use in his land, which he cannot reclaim at pleasure. Nor is it necessary to prove a use for any determinate period, in a case of this kind, where such use is accompanied by proof of the conduct, or unequivocal acts or declarations, of the owner of the fee. A dedication of property to public use does not depend upon the lapse of time, but upon the intention and acts of the parties. Keeping these rules in view, what proof is there of a dedication to the public by Griswold, or subsequent owners, of the right to float logs in the Callikoon creek? I cannot perceive any, further than the fact of mere *user* by a few individuals of the neighborhood. Griswold was a non-resident. In 1814, soon after his purchase, he erected a dam across the stream, which has been maintained to the present time, with the exception of four or five years. He kept a boom across the pond and claimed the right to prevent floating. The use for floating was not exercised for several years succeeding the erection of his dam. His agent, and subsequent owners, at divers times interfered to control the floatage, and demanded and actually received compensation for the privilege. In other cases consent was asked and obtained. The exercise of the right has neither been uninterrupted or acquiesced in by Griswold or subsequent owners. No act or declaration of theirs is shown evincing an intention to unqualifiedly devote to the public the use of the stream to float logs or rafts of logs. The proof, in my opinion, fails to show a case of *dedication* to the public.

The plaintiffs are entitled to the relief demanded in the complaint; and the proper judgment or order must be entered accordingly.

[SULLIVAN SPECIAL TERM, May 29, 1852. *Wright*, Justice.]